IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - - - - - - -o O o- - - - - - - - - -

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 16-60607 |
| | : | |
| THOUGHTWIRE MEDIA, LLC | : | CHAPTER 11 |
| | : | |
| Debtor | : | JUDGE KENDIG |
| | : | |
| | : | |
| | : | |
| | : | |

- - - - - - - - - -o O o- - - - - - - - - -

**COMBINED OBJECTION OF CREDITOR, INVESTMENT GUIDANCE SYSTEMS, LLC, TO:**

**I.     DEBTOR'S MOTION FOR ORDER AUTHORIZING (I) THE SALE OF SUBSTANTIALLY ALL OF ITS ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES (Doc 12) AND MEMORANDUM IN SUPPORT (Doc 14);**

**AND**

**II.     DEBTOR'S AMENDED MOTION FOR AN ORDER APPROVING BIDDING PROCEDURES REGARDING DEBTOR'S PROPOSED SALE OF SUBSTANTIALLY ALL OF ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND  THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES (Doc 24)**

Creditor Investment Guidance Systems, LLC ("IGS"), by and through the undersigned counsel, hereby files its Combined Objection to I. Debtor's Motion for Order Authorizing (I) The Sale of Substantially All of Its Assets, Free and Clear of Liens, Claims, Encumbrances, and Interests and (II) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (Doc 12) (the "Motion to Sell") and Memorandum in Support (Doc 14); and II. Debtor's Amended Motion for an Order Approving Bidding Procedures Regarding Debtor's Proposed Sale of Substantially All of Its Assets Free and Clear of Liens, Claims, Encumbrances, and Interests

and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (Doc 24) (the "Bidding Procedures"). In support of its Objection, IGS asserts the following.

## I.  BACKGROUND

1.  IGS is a Florida limited liability company with its principal place of business located in Stoughton, Massachusetts.

2.  Between August and October of 2010, IGS, through its principal, entered into two contracts (collectively, the "Contract"), attached collectively hereto as **Exhibit "A,"** with Advanced Media Productions, Inc. ("AMP") by which AMP agreed to develop a website for an online investment and stock trading information service and to design and implement an online marketing plan for a fixed fee for IGS. Once the website went "live," the Contract anticipated that IGS would pay AMP monthly fees for its marketing services.

3.  Pursuant to the Contract, AMP agreed to start development of the website on October 19, 2010 and agreed to a final "live" date of January 17, 2011. After going "live," AMP projected that IGS would earn revenues of $825,000.00 in 2011, $2,000,000.00 in 2012, and $3,000,000.00 in 2013 through the website and the marketing plan.

4.  In total, IGS paid $28,658.00 to AMP for its services and incurred substantial business development costs in reliance upon AMP's promises in the Contract, but ultimately, AMP failed to fully comply with the terms of the Contract by not completing the website and marketing plan by the agreed upon date.

5.  In early December of 2011, the principals of AMP informed IGS that Thoughtwire Media, LLC (the "Debtor") had acquired AMP's assets, including the Contract, pursuant to a Purchase Agreement, defined below.

6.      Upon learning of this, IGS insisted that the Debtor fulfill the terms of the assigned Contract, but the Debtor failed to do so, arguing that it had not accepted an assignment of the Contract.  Neither AMP nor the Debtor provided IGS with a copy of the Purchase Agreement in support of its position.

7.      As a result, in order to enforce the terms of the Contract, IGS was forced to commence suit (the "State Court Case") against the Debtor in 2012 in the Superior Court for the Commonwealth of Massachusetts for breach of contract, breach of the covenant of good faith and fair dealing, unfair or deceptive practices, unjust enrichment, and conversion.

8.      It was not until March of 2014, over two years after the Contract had been assigned and over 18 months after a discovery request had been issued in the State Court Case, that the Debtor produced the Agreement for Purchase and Sale of Assets, executed on October 25, 2011, and an Addendum Agreement, executed on October 27, 2011, (collectively, the "Purchase Agreement"), between the Debtor and AMP.  The Purchase Agreement is attached hereto as **Exhibit "B."**

9.      The Purchase Agreement did in fact reflect that the Debtor had purchased customer records and executory contracts, including the Contract, from AMP.

10.     The State Court Case was set for trial when the Debtor commenced the instant bankruptcy proceeding as a means of avoiding its liability to IGS under the Contract.

11.     As of October 22, 2015, IGS calculated its damages against the Debtor to be $1,138,383.00, with interest continuing to accrue after said date (the "IGS Claim").

3

## II. COMBINED OBJECTION TO MOTION TO SELL, MEMORANDUM IN SUPPORT, AND BIDDING PROCEDURES

12.     There are many troubling aspects to this bankruptcy proceeding that require greater scrutiny by this Court, the United States Trustee, and IGS of the Motion to Sell, the Memorandum in Support, and the Bidding Procedures and warrant their denial.

13.     First, the Debtor's only secured lenders are an affiliate, Directory Concepts, Inc. ("Directory Concepts"), and the principal it shares with the affiliate, Thomas C. Hickox ("Hickox"), who is also the managing and sole member of both the Debtor and the affiliate, Directory Concepts.  Such an insider relationship between a debtor and a lender creates an environment in which undue influence may be exercised by the lender over the debtor to the detriment of the debtor's unsecured creditors.

14.     Second, as a potential example of that undue influence, the first two loan agreements and one of the promissory notes related thereto, executed by the Debtor and/or Directory Concepts, fail to contain maturity dates or demand features and provide discretion to Directory Concepts to "unilaterally change any provision for the accrual or payment of interest by mailing to Company [the Debtor] a written notice to that effect not less than 15-days prior to the effective date of the proposed change."  See the aforementioned loan agreements and promissory note attached hereto collectively as **Exhibit "C."**  Such provisions demonstrate the degree of control that Directory Concepts and Hickox, as managing and sole member of Directory Concepts, has over the Debtor.  Additionally, the provisions, together with the insider relationship, call into question the true nature of the supposed lending relationship.  Was it instead a disguised equity contribution that Directory Concepts made to the Debtor?

15.     Third, the valuation filed by the Debtor that purportedly supports the Motion to Sell:  a. is provided by an entity and an individual lacking accreditation; b. relies upon an

4

improper valuation multiple and does not follow standard, practiced valuation guidelines; c. relies upon inaccurate or incomplete data; d. arrives at a faulty conclusion; and e. fails to provide all of the data supposedly supporting its faulty conclusion. *See* the Company Valuation and Liquidity Analysis Report attached hereto as **Exhibit "D."**

  a. For example, although M. Eric Furlow ("Furlow") of Furlow Consulting LLC provides information as to his experience in the mergers and acquisitions area, he fails to provide any information as to his education or special certifications, such as MMA, CVA, and CBA, demonstrating that he is qualified to render his business valuation opinion.

  b. Further, according to the 2015 Business Reference Guide published by Business Brokerage Press and compiled by Tom West, the proper valuation multiple for a software, web development, hosting, and internet marketing company is one to three times the trailing 12 months revenue. The one times revenue multiple is used for companies that have either flat or declining revenue, while the two to three times revenue multiple is used for companies with increasing revenue. Hence, the most common valuation multiple is two times 12 months revenue. Furlow's use of a valuation multiple of one times less than a 12 month period appears to be incorrect and does not follow standard, practiced guidelines.

  c. Additionally, the 2015 revenue numbers that Furlow uses in his business valuation, dated December 1, 2015, are less than the total revenue number as reported on the Debtor's Statement of Financial Affairs for year 2015 in response to Question 1. *See* Statement of Financial Affairs (Doc 1). Furlow states that 2015 total revenue was $1,467,000.00, while the Debtor reported 2015 total revenue on the Statement of Financial Affairs as being $2,158,216.86. This is a variance of over half a million dollars and is another reason that Furlow's business valuation should be considered suspect.

  d. Comparing the gross revenue between 2014 and 2015, as stated by the Debtor in response to Question 1 on the Statement of Financial Affairs, gross revenue increased from 2014, in the amount of $1,474,097.76, to 2015, in the amount of $2,158,216.86, or significantly 46%. Because revenues increased between 2014 and 2015, Furlow should have used a valuation multiple of two to three times $2,158,216.86, which would mean that an appropriate

5

valuation of the Debtor's assets would have been in the range of $4.3 million to $6.5 million.

e.     Finally, Furlow states that before deduction for corporate overhead, most of the Debtor's divisions had positive revenue. Furlow never states the total dollar amount for corporate overhead in 2015 nor does he explain of what it is comprised.

Because of the aforementioned unreliability of Furlow's report, the business valuation upon which the proposed purchase price and Directory Concept's credit bid is predicated cannot be trusted.

16.     Fourth, the Bidding Procedures fail to contain any information as to how the Debtor plans to market its assets and to whom the Debtor plans to market its assets and fail to contemplate the hiring of an independent third party to conduct those marketing efforts.  In fact, the insider purchaser, coupled with the truncated nature of the sale process, effectively prevents any sort of marketing efforts and appears to be designed to avoid any prospect of true competitive bidding.  To the Debtor and Directory Concepts, this sale appears to be a foregone conclusion.

17.     Fifth, as a footnote to its pleadings, the Debtor acknowledges using the following business names during its operations:  VPS6, Thoughtwire Hosting, Thoughtwire Marketing, and Thoughtwire Mobile and Websites.  What the Debtor does not acknowledge, however, is that at least three out of four of those business names are in reality separate legal business entities, registered with the Ohio Secretary of State of Ohio.  For example, see the documents obtained from the Ohio Secretary of State website for the entities Thoughtwire Hosting LLC, Thoughtwire Marketing LLC, and Thoughtwire Mobile and Websites LLC, collectively attached hereto as **Exhibit "E,"** which show that all three business entities formerly did business under one or more other names and were initially registered to do business in the State of Ohio by either Hickox or

6

the Debtor's corporate counsel, Wagner Law Firm PLL or Jay D. Wagner. The Debtor's lack of clarity as to these separate legal entities begs questions as to their interrelatedness with the Debtor, whether they were treated as actual separate legal entities, and if they were not, what is the impact upon the creditors of this bankruptcy estate.

18.     Finally, the Debtor filed bankruptcy just six weeks prior to the then scheduled trial in the State Court Case, and other than the IGS Claim, which the Debtor disputes, it only has 14 unsecured creditors that are owed a mere $59,627.10. *See* Schedule E/F filed on March 25, 2016 (Doc 1). Even worse, pursuant to Amended Schedule G (Doc 46) and Schedule B of the Asset Purchase Agreement (Doc 47), both of which were filed by the Debtor on April 6, 2016, the Debtor proposes that executory contracts with Microsoft and Google will be assumed by Directory Concepts in the proposed sale. If these are the same contracts under which the Debtor owes $24,147.89 to Microsoft and $23,049.41 to Google, as listed on Schedule F (Doc 1), then the Debtor has effectively filed a Chapter 11 reorganization case to pay a mere $12,429.80 pursuant to a plan. Obviously, that is not the Debtor's goal. The Debtor's goal is to protect its assets for Hickox and its affiliate, simply clothed in the new purchaser, while freezing out the IGS Claim.

19.     All of these troubling aspects should cause this Court to conclude that heightened scrutiny and additional time is required to permit the United States Trustee, IGS, and any other creditors to explore the relationship between the Debtor, Directory Concepts, Hickox, and possibly any other legal entities in which any of those parties are affiliates, before the Bidding Procedures should be approved or any sale of the Debtor's assets should be allowed.

20.     In addition, there may well be factors in play here that through discovery would justify the equitable subordination of the claims of Directory Concepts and Hickox to those of

unsecured creditors, the recharacterization of the claims of Directory Concepts and Hickox from debt to equity, or the allowance of a sale at an appropriate time and in an appropriate way but subject to the IGS Claim.[1]  Alternatively, there may be cause to dismiss the case under 11 U.S.C. § 1112 as having been filed in bad faith.  All of these are potential remedies within the Sixth Circuit Court of Appeals where an insider relationship exists between a debtor and its lender, and IGS requests that the Court deny approval of the Motion to Sell, the Memorandum in Support, and the Bidding Procedures to provide it an opportunity to conduct an appropriate inquiry regarding the aforementioned and related matters, through reasonable discovery and examination.

WHEREFORE, for the foregoing reasons, IGS respectfully requests that the Court deny the Motion to Sell, disallow the Bidding Procedures, and grant such other relief that is equitable and just.

BLACK, McCUSKEY, SOUERS & ARBAUGH


By: /s/  Chrysanthe E. Vassiles
     Chrysanthe E. Vassiles (#0066402)
     220 Market Ave., South, Suite 1000
     Canton, OH  44702
     Phone: (330) 456-8341
     Fax: (330) 456-5756
     E-Mail:   cvassiles@bmsa.com

---

[1] Depending upon the outcome of the hearing on the Motion to Sell, the Memorandum in Support, and the Bidding Procedures, IGS reserves its right to object to further extensions of cash collateral to prevent an impairment of the IGS Claim.

8

## CERTIFICATE OF SERVICE

I, Chrysanthe E. Vassiles, hereby certify that the foregoing Combined Objection to I. Debtor's Motion for Order Authorizing (I) The Sale of Substantially All of Its Assets, Free and Clear of Liens, Claims, Encumbrances, and Interests and (II) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (Doc 12) and Memorandum in Support (Doc 14); and II. Debtor's Amended Motion for an Order Approving Bidding Procedures Regarding Debtor's Proposed Sale of Substantially All of Its Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (Doc 24) was electronically transmitted on or about this 8th day of April, 2016 via the Court's CM/ECF system to the following who are listed on the Court's Electronic Mail Notice List:

- **Anthony J. DeGirolamo**    ajdlaw@sbcglobal.net, amber_weaver@sbcglobal.net;sedlaw@sbcglobal.net;G23630@notify.cincompass.com
- **Tiiara N. A. Patton**    tiiara.patton@usdoj.gov
- **United States Trustee**    (Registered address)@usdoj.gov


/s/ Chrysanthe E. Vassiles
Chrysanthe E. Vassiles

287644